JM:JAJ:SS:JPN
F.#2012R00484

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -               Cr. No. <u>12-224 (JBW)</u>

GARTH PETERSON,

            Defendant.

- - - - - - - - - - - - - - - - -X

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

JEFFREY H. KNOX             LORETTA E. LYNCH
ACTING CHIEF, FRAUD SECTION   UNITED STATES ATTORNEY
CRIMINAL DIVISION          EASTERN DISTRICT OF NEW YORK
DEPARTMENT OF JUSTICE
1400 New York Avenue, NW
Washington, DC 20530       271 Cadman Plaza East
                        Brooklyn, New York 11201

STEPHEN J. SPIEGELHALTER    JOHN P. NOWAK
Trial Attorney            Assistant United States Attorney
(Of Counsel)             (Of Counsel)

## PRELIMINARY STATEMENT

On April 25, 2012, Garth Peterson appeared before the Court and, pursuant to a written plea agreement, pleaded guilty to one count of conspiracy to circumvent the internal controls of Morgan Stanley, in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78m(b)(5), 78ff(a). As a result of the conspiracy, Peterson and two coconspirators misappropriated from Morgan Stanley and its investors a multimillion-dollar interest in a Shanghai building.

Peterson's crime netted Peterson an interest in the stolen asset worth nearly $3 million and the three conspirators a total interest worth nearly $7 million. The manner in which Peterson committed this crime was particularly damaging. In the course of taking the interest, Peterson coopted and corrupted an official of the Chinese government——the type of activity that Congress, in passing the Foreign Corrupt Practices Act, deemed particularly odious because of its potential effects on relations between the United States and other countries and between American companies and the countries in which they do business.

In light of the seriousness of Peterson's criminal activity, but in recognition of Peterson's early acceptance of responsibility, the government respectfully asks the Court to sentence Peterson within the advisory sentencing guidelines range. The government further requests that, pursuant to Peterson's plea agreement (¶ 5), the Court impose as part of any

sentence a requirement that Peterson continue to cooperate fully with the SEC's efforts and those of the Court-appointed receiver to forfeit, seize, or otherwise obtain control of assets that were instrumentalities and proceeds of Peterson's crime.

Peterson should not be sentenced below the advisory guidelines, as he has requested in his sentencing memorandum (abbreviated below as "def."). As outlined below, Peterson's memorandum contains numerous factual misrepresentations in support of his desired probationary sentence. Among other things, Peterson distorts the reason that he stole an interest in Tower Two and shared that interest with an official of the Chinese government, and Peterson overstates the extent of his cooperation with the government during its investigation. Peterson's revisionist gloss of the facts seriously undermines the notion that he has truly accepted responsibility for his crimes and understands the gravity of his fraud. It also fundamentally misstates the character of his crime; Peterson did not make a single mistake, but instead engaged in a multi-year conspiracy during which Peterson made and caused to be made numerous misrepresentations to his employer.

A probationary sentence or a period of incarceration significantly below the guidelines range is unwarranted, unjust, and unreasonable. For the reasons set forth below, the

government respectfully requests that the Court sentence the defendant to at least 51 months' incarceration.

## I.    FACTUAL BACKGROUND

Garth Peterson worked for Morgan Stanley from 2002 until 2008, during which time he held various positions, including Managing Director in charge of the Morgan Stanley Real Estate Group's ("MSRE") Shanghai office in the People's Republic of China ("China").  Presentence Investigation Report ("PSR") ¶ 5.  During his time at Morgan Stanley, Peterson was involved in more than two dozen real-estate transactions.[1]

As the Morgan Stanley employee in charge of MSRE's Shanghai office, Peterson regularly interacted with Morgan Stanley's management and with officials of the Chinese government who were responsible for overseeing, selling, and buying the real estate holdings of various levels of the Chinese government and developing real estate in China's cities.  Among others, Peterson interacted with a senior executive of the Shanghai Luwan District's real-estate-development arm, Shanghai Yongye Enterprise (Group) Co. Ltd. ("Yongye").  PSR ¶ 8.  The senior executive, identified in the Criminal Information as "Chinese Official 1," Criminal Information ("CI") ¶ 24, was a government official who was, in many respects, important to Peterson's

---

[1]    Before Peterson worked for Morgan Stanley, he worked for four years for J.P. Morgan Chase in Hong Kong.  PSR ¶ 66.

success at Morgan Stanley and to Morgan Stanley's success in
Shanghai.  Peterson also interacted regularly with those who
represented the Chinese government in transactions, including a
Canadian attorney who represented Yongye, identified in the
Criminal Information as "Canadian Attorney 1."  PSR ¶ 9.

By the time Peterson joined Morgan Stanley in 2002,
Peterson already had a close personal relationship with Chinese
Official 1.  CI ¶ 9.  During his time with Morgan Stanley,
Peterson relied upon Chinese Official 1 to confer specific
benefits upon Morgan Stanley, thereby increasing Peterson's own
stature within Morgan Stanley.  Among other things, Chinese
Official 1 introduced Peterson and Morgan Stanley to numerous
commercial and residential real-estate-development opportunities
in Shanghai, including opportunities involving Shanghai-
government properties that Yongye owned or developed, CI ¶ 24;
gave Morgan Stanley non-public information concerning competing
bids for Shanghai property, CI ¶ 32; agreed on Yongye's behalf to
sell interests in valuable real estate to Morgan Stanley, CI ¶
30; helped Morgan Stanley navigate various Chinese legal
requirements, including obtaining necessary approvals from other
parts of the Chinese government, CI ¶ 33; and introduced Peterson
and Morgan Stanley to other powerful Chinese officials.

Peterson did his best to cultivate this valuable
relationship with Chinese Official 1 by, among other things,

4

surreptitiously engineering a system to remunerate Chinese
Official 1 for the official's work on Morgan Stanley's behalf.
In perpetrating the criminal conduct charged in this case,
Peterson ultimately succeeded in causing Morgan Stanley to
include Chinese Official 1, a Canadian attorney, and Peterson in
an extraordinarily lucrative opportunity to purchase (at a
steeply discounted price) an interest in a Shanghai building that
a Morgan Stanley Real Estate Fund ("MSREF") and other investors
had purchased in 2004, identified in the Criminal Information as
"Tower Two."  Specifically, in March 2006, after more than a year
of Peterson's lobbying, Morgan Stanley sold a 12-percent interest
in Tower Two to what Morgan Stanley believed was Yongye, through
what Morgan Stanley believed to be an offshore holding company
that Yongye owned and operated.  CI ¶ 36.  In reality, Morgan
Stanley unwittingly sold the 12-percent interest to Peterson,
Canadian Attorney 1, and Chinese Official 1.  CI ¶¶ 37, 41.

        In order to effect this fraudulent purchase and to
conceal the true identity of the purchaser, Peterson repeatedly
and explicitly lied to his Morgan Stanley supervisors and co-
workers over a more-than-two-year period about the true identity
of those purchasing an interest in Tower Two.  CI ¶ 39.  Peterson
and Canadian Attorney 1 also obtained, and Chinese Official 1
operated, a shell company in the British Virgin Islands,
Asiasphere Holdings Limited ("Asiasphere"), to hold the interest.

CI ¶¶ 12, 38.   Further criminal efforts included Canadian
Attorney 1 lying to Morgan Stanley personnel conducting due
diligence about Asiasphere's beneficial owner, CI ¶ 39; Canadian
Attorney 1 and Chinese Official 1 opening offshore bank accounts
for Asiasphere; and the conspirators obtaining periodic equity
distributions from MSREF, CI ¶ 45.

All the while, the value of the conspirators' interest
in Tower Two grew substantially.   Chinese Official 1 owned 47
percent of Asiasphere.   Peterson and Canadian Attorney 1
indirectly owned the remainder.   PSR ¶ 7.   By purchasing in 2006
at MSREF's 2004 basis, the Chinese Official's portion of the
asset was immediately worth $2.88 million more than he paid for
it.   CI ¶ 42.   In addition to holding their appreciating asset,
the conspirators also accepted in 2007 and 2008 equity
distributions related to their Tower Two investment.   CI ¶ 45.
By March 2010, the conspirators' interest in Tower Two was worth
approximately $5.39 million more than what they paid for it.   PSR
¶ 13, PSR Addendum at 2.

Peterson clearly knew better.   During Peterson's time
with Morgan Stanley, Morgan Stanley told Peterson more than half
a dozen times that the FCPA criminalized transferring anything of
value to officials of foreign governments for certain business-
related reasons.   PSR ¶ 5.   Morgan Stanley specifically trained
Peterson that employees of Chinese state-owned entities, like

Chinese Official 1, were government officials under the FCPA. PSR ¶ 5. Morgan Stanley also provided Peterson at least 35 FCPA compliance reminders, and he repeatedly certified in writing that he was abiding by the rules. CI ¶ 20. He was not. Each of Peterson's certifications was but another lie that lulled his employer into trusting Peterson.

## II.  SENTENCING ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). "Even after Gall and [Kimbrough v. United States, 552 U.S. 85 (2007)], sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a body of casual advice." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). Next, a sentencing judge should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Gall, 552 U.S. at 49-50 (citation and footnote omitted).

For all of the reasons listed below and in light of the factors set forth in 18 U.S.C. § 3553(a), the government respectfully requests that the defendant be sentenced within the advisory guidelines range.

## A.   Sentencing Guidelines

The parties and the Probation Department all agree that the loss caused by Peterson's conduct exceeded $2.5 million, but was less than $7 million.  This loss amount ($5.39 million) represents the net value of the asset that Morgan Stanley sold to the conspirators as a result of their circumvention of Morgan Stanley's internal controls (i.e., the current value of the asset, less the equity investment that the conspirators made when surreptitiously purchasing the asset).

In the plea agreement, Peterson stipulated to the following guidelines calculation:

| | |
|---|---|
| Base Offense Level<br>(2X1.1, 2B1.1(a)(1)) | 7 |
| Plus: Loss Exceeds $2,500,000<br>(2B1.1(b)(1)(J)) | +18 |
| Plus: Substantial part of scheme outside U.S.<br>(2B1.1(b)(9)(B)) | <u>+ 2</u> |
| Total: | 27 |

Peterson is entitled to a three-level reduction for early acceptance of responsibility, yielding a total offense level of 24.  This calculation results in a sentencing range of 51-63

8

months.  Because 18 U.S.C. § 371 carries a five-year statutory maximum, Peterson's effective guidelines range is 51-60 months. The government recognizes that the Presentence Investigation Report suggests additional enhancements to Peterson's guidelines, based upon Peterson's receipt of more than $1 million from a financial institution and Peterson's role in the offense (PSR ¶¶ 25, 27).  However, in accordance with the terms of the plea agreement, the government respectfully submits that an advisory range of 51-60 months is appropriate in this case.

Despite several false self-justifications for his crime in his recent sentencing submission, Peterson should receive a three-point reduction for acceptance of responsibility because he has taken several affirmative steps that demonstrate his acceptance of responsibility for the crime he committed.  During the course of the government's investigation, Peterson met with investigators several times.  Peterson also self-surrendered, sparing the government the time and expense of seeking his extradition.  Finally, Peterson readily entered a plea agreement when one was offered, and he agreed to relinquish control of the asset.

### B.   Specific Deterrence and Peterson's Rehabilitation

Peterson's sentencing memorandum, which contains several misrepresentations, calls into question the notion that this crime was an isolated lapse in judgment, that he is

9

rehabilitated, or that he is unlikely to commit additional crimes. For example, Peterson unconvincingly claims that he was motivated to commit his crime because he wanted to reclaim, through "self help," an asset that rightfully belonged to his mother, Def. at 3 (describing his "mother's holding in the real estate investment"); that he only gave Chinese Official 1 nearly 50 percent of Peterson's ill-gotten asset as an expression of "guanxi," id. at 20-23, something Peterson calls the "proper cultural context" of his crime, id. at 13; and that his crime represented an isolated lapse in judgment, id. at 27. None of that is true.

   ***Self Help.*** Peterson's argument that he was engaging in "self-help" to regain an asset that rightly belonged to his mother is a recently fabricated, post-hoc justification for his crime. Peterson variously claims that "Peterson's mother asked him to help her invest her retirement funds," def. at 2, that "Peterson invested his mother's retirement money" before 2002 in a particular Shanghai development (the "Investment") that Morgan Stanley bought out about two years later, id., that Morgan Stanley's purchase of the development company that originally held the Investment "forced" Peterson to sell his mother's holding in the real estate investment, id. at 4, and that "Peterson's criminal misconduct arose from an ill-conceived and misplaced attempt to protect his mother's investment," id. at 4.

10

Peterson's explanation about who owned the Investment is wholly inconsistent with his prior disclosures made around the time of the Investment. In fact, according to Peterson's own contemporaneous descriptions of the Investment, the investment opportunity that Peterson claims was "lost" was his, not his mother's. The Investment was held through a company called "Paraplay Investments Ltd" ("Paraplay"). On August 8, 2002, referring to the Investment, Peterson declared to Morgan Stanley in writing that Peterson was "holding <u>my investment</u> in the Project indirectly through <u>my 100%-owned holding company</u>, Paraplay Investments Ltd." (emphases added). The government has attached Peterson's declaration to this sentencing submission as Exhibit 1. Thus, in 2002, before he had the incentive to mislead the Court, he made no mention of his mother or her investment interests. An investment-structure chart that Peterson tendered with his declaration shows that Peterson owned 100% of Paraplay. Exh. 1. Later in the same document, Peterson declares that he is the "100% beneficial owner" of Paraplay. <u>Id.</u>

Tellingly, this is not the first time he has dissembled about this issue. In an email exchange between Peterson and a trust employee[2] in June 2005, years after he now claims that his mother actually owned the Investment through Paraplay, Peterson

---

[2]     As illustrated below, during this period, Peterson held his interest in Paraplay through a trust that operated Paraplay according to Peterson's instructions.

for the first time instructed the trust employee to change
Paraplay's ownership designation to show that Peterson's mother
owned 50% of Paraplay.  Peterson explained

> I am basically trying to help my mom to renew her
> permanent residence in Singapore.  She believes that it
> will be helpful if the authorities believe she has
> substantial resources in case of medical issues.  So I
> suggested getting her a letter showing she is a 50%
> beneficial owner of Paraplay. . . . Actually, I have
> thought of the benefit of making her a 50% beneficial
> owner--if something happens to me she is more secure.

Exh. 2.  Lest Peterson inadvertently give his mother actual
access to his money or company, though, Peterson also instructed
the trust employee that "I will be the only person giving
instructions for the account."  Id.  Peterson's misleading use of
his mother as a shield from incarceration is unsettling.

Nor, frankly, would Peterson's "self-help" be
commensurate with the "loss" of opportunity to continue to hold
the Investment.  Peterson's initial Investment through Paraplay
was approximately $1 million.  Exh. 1.  Peterson's Investment in
Project Wally represented a very small percentage of Project
Wally's overall value.  As "self-help," Peterson took an interest
in Tower Two that was much larger as a percentage of Tower Two's
value than Peterson owned in Project Wally and that was, in
strictly monetary terms, almost three times larger than his
Investment in Project Wally.  Peterson's "self-help" was not
"self-help."  It was punitive, or greedy, or likely both.

12

Moreover, even if Peterson's new recitation of the facts relating to his "mother's Investment" were accurate, it is hard to see how it justified—even in his own mind—a self-help remedy or any sort of remedy, given that his "mother's" Investment in the project had already been wildly successful and very profitable. In Peterson's August 2002 declaration to Morgan Stanley about Paraplay's interest in the Investment, Peterson declared that he had invested $1.02 million in the project. Exh. 1. In November 2004, Peterson wrote to the trust employee that was a nominal director of Paraplay that Peterson had already received "almost all the initial investment back." Exh. 3. Further, he wrote, "[i]n all there's another approx USD 900k still to come." Id. When "she" sold the Investment to Morgan Stanley at market price, "she" was not out any money at all.

**_Guanxi._** Peterson's assertion that he gave Chinese Official 1 a $3 million-plus interest in Tower Two as an expression of "guanxi" is also demonstrably false. Peterson says that "guanxi" is "a term that describes the exchange of gifts or favors in a professional setting," def. at 20. The source upon which Peterson relies, Gregory M. Lipper, [FCPA] and the Elusive Question of Intent, 47 Am. Crim. L. Rev. 1463, 1485 (2010), describes the parameters of guanxi, which typically involves small tokens: the "exchange of gifts, favors, and banquets." Here, Peterson stole a $7 million piece of a building and gave a

13

Chinese public official a piece worth more than $3 million.  The grant of an ill-gotten, multimillion dollar interest in an apartment building is hardly the type of item one typically exchanges in Chinese culture.  Any suggestion to the contrary borders on the offensive.

More to the point, Peterson's claim that he was simply bestowing a gift upon a father figure is patently false. Peterson already admitted that he "sought <u>to compensate</u> Chinese Official 1, while Chinese Official 1 was still a government official, for Chinese Official 1's assistance to Morgan Stanley and Peterson in Project Cavity."  CI ¶ 36 (emphasis added).  More fundamentally, Peterson could not have stolen his interest in Tower Two without Chinese Official 1's help.  The conspirators cemented Morgan Stanley's belief that Yongye was purchasing the Tower Two interest by having Chinese Official 1, an individual that Morgan Stanley knew to be a senior executive with Yongye, sign the partnership agreement on "Yongye's" behalf.  Morgan Stanley employees cited this as crucial to their belief that Yongye was purchasing the 12-percent interest in Tower Two. Chinese Official 1 was not an individual who simply benefitted from Peterson's beneficence; he was an absolutely necessary conspirator.

Even if Peterson's "self-help" and "guanxi" arguments were based upon a true factual recitation——which they are

14

not—they are legally irrelevant.  Peterson cites <u>United States</u> <u>v. Ranum</u>, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005), for the proposition that an individual who "did not act for his personal gain or for improper personal gain of another" may be entitled to a downward variance due to the lack of a more blameworthy motive. Def. at 23.  Ranum, a bank employee, was convicted after misdescribing on bank documents how much credit he extended to a company that eventually failed, causing Ranum's employer to lose $1.134 million.  <u>Id.</u> at 987-989.  The <u>Ranum</u> court found in support of the downward variance that Ranum did not personally benefit, did not know the individuals to whom he extended the credit, had no intention to harm his employer, and truly believed that the individuals to whom he extended credit might be able to repay the loan.  <u>Id.</u> at 990.

None of the conditions present in <u>Ranum</u> is present here.  Even crediting Peterson's dubious factual recitation, Peterson stole a multimillion interest in a building for his mother, a father figure, and a Canadian attorney, all of whom he knew quite well.  There was, moreover, no chance that Morgan Stanley would be made whole at the end of the transaction.  And the loss to Morgan Stanley was nearly five times larger than the loss that Ranum inflicted upon his bank.  Ironically, although Peterson cites <u>Ranum</u> in support of the proposition that he should not be sentenced to prison, Ranum was.  <u>Id.</u> at 989.

15

Peterson's reliance upon illegal reentry cases for the proposition that the Court should consider Peterson's assimilation into Asian culture, def. at 22, is equally misplaced.  Those cases stand for the proposition that an individual who illegally reenters the United States after living here for a lengthy period is motivated by an affinity for the United States, rather than a financial motive.  See, e.g., United States v. Todd, 618 F. Supp. 2d 1349, 1353-54 (M.D. Ala. 2009). Peterson apparently wants the Court to leap to the conclusion that it should excuse Peterson's theft of a multimillion dollar asset as simply one more byproduct of his assimilation into Chinese culture.  That is, for obvious reasons, not the import of Todd's holding. Corrupting a Chinese official in the course of stealing an interest in a building cannot be dismissed as a symptom of Peterson's affinity for China or its culture.  If anything, his actions demonstrate quite the opposite.

**_Recidivism._**  Peterson's recidivism arguments—that he is unlikely to recidivate because he is older (43), def. at 26-27, and has not been previously charged with a crime, id. at 27-28—are equally unconvincing.[3]  The cases that Peterson cites for

---

[3]   Peterson's age-related argument is misplaced and does not merit significant consideration.  The Sentencing Guidelines, which are engineered to avoid recidivism, encourage consideration of age only when the offender is infirm.  USSG § 5H1.1.  Beyond infirmity, which itself deters further criminal behavior, age is an extraordinarily malleable sentencing concept; younger offenders still have a chance to rehabilitate, and elderly

16

the contention that "older" offenders are less likely to recidivate all illustrate why age is not a proper consideration in Peterson's case: they all address aging drug dealers.  <u>United States v. Hernandez</u>, No. 03 CR 1257, 2005 WL 1242344, *1 (48-year old member of a heroin-distribution conspiracy); <u>United States v. Carmona-Rodriguez</u>, No. 04 CR 667, 2005 WL 840464, *1 (55-year-old heroin dealer); <u>United States v. Nellum</u>, No. 04-CR-30, 2005 WL 300073, *1 (57-year-old cocaine distributor).  Peterson's crime is decidedly less dangerous and less physically intense, and there is no reason to believe that he has aged out of the possibility of committing additional white-collar crimes.

Peterson's argument that "his crime was anomalous with Peterson's otherwise law-abiding life," def. at 27, is equally unavailing.  The sentencing guidelines have already accounted for the predictive effect of previous offenses——the very reason that offenders are categorized in the first place.  The argument that all Criminal History Category 1 offenders deserve below-guidelines sentences is just an argument that the guidelines should not apply to first-time offenders.

Perhaps more importantly in Peterson's case, there are reasons to believe that the offense to which Peterson pleaded

---

offenders may lack the physical ability to reoffend.  Over-reliance on age as a sentencing factor, then, would result in the absurd result that only middle-aged offenders receive a guidelines sentence.

guilty are not so isolated.  Peterson agreed to disgorgement and a lifetime ban from associating with SEC-regulated firms in part because he allegedly lied to Morgan Stanley about having surreptitiously purchased a stake with Canadian Attorney 1 in a Morgan Stanley investment and then ordered a front man to lie to Morgan Stanley about the true identity of the investors; lied to Morgan Stanley about his outside ownership in various investments; and arranged to pay Chinese Official 1 for work done on Morgan Stanley's behalf, then secretly paid Chinese Official 1 even after Morgan Stanley directed Peterson not to, and kept for himself a portion of the illicit payment.  As noted above, white-collar crimes are difficult to detect, but Peterson appears to have been caught committing several.  He has, moreover, shown no compunction about misleading this Court in his sentencing memorandum, a surely inauspicious start to his life after the crime with which he has been charged here.[4]

---

[4]      Peterson made several other arguments that are not worthy of extended consideration.  For instance, Peterson distorts the basis for the guidelines loss calculation and the import of the loss, arguing that: (i) because Morgan Stanley would have sold to another party had Peterson not stolen the 12-percent interest in Tower Two, "Morgan Stanley was not robbed of the asset in the traditional way," def. at 31; and (ii) the loss is arbitrary because its value depended upon the market for the asset, id.  The former argument is wrong for three reasons: there is no definitive evidence that Morgan Stanley would have sold to another party, though it is certainly possible; the criminal information flatly states that Morgan Stanley sold the asset to Yongye (or so it thought) because Yongye brought value that a private investor would not have brought, CI ¶ 34, suggesting that Morgan Stanley would only have sold to a third party that offered

***Cooperation.*** Relatedly, Peterson's claims of extensive cooperation are also troubling. Peterson's assertion that "his desire to cooperate with the government required that he remain away from his family," def. at 25, is simply false. Prosecutors asked to meet with Peterson several times. But the government neither needed nor asked Peterson to reside in the United States during the pendency of his case. Indeed, prosecutors believed that Peterson resided in Asia.

The real reason that Peterson resided in the United States had nothing to do with Peterson's efforts to assist the government's investigation. On the contrary, Peterson's wife's letter suggests, def. at Exhibit C, that Peterson left his home following a period of increasing marital tension stemming from his drinking. Moreover, Peterson's claims to have provided

---

similar benefits, the value of which Peterson deprived Morgan Stanley by taking it for himself; and Peterson defrauded Morgan Stanley and its investors of the right to include or exclude others from its solely owned investment as they saw fit——which is <u>exactly</u> what it means to be "robbed . . . in the traditional way," <u>see</u> <u>College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 673 (1999) ("The hallmark of a protected property interest is the right to exclude others. That is one of the most essential sticks in the bundle of rights that are commonly characterized as property." (internal quotation omitted)). The latter argument is simply immaterial. All property is valued based upon market demand. Even currency is valued with respect to what it can purchase, something that changes over time. This is surely no reason to abandon the loss-based guidelines governing fraud convictions. Moreover, as Peterson himself agreed, because Morgan Stanley sold to the conspirators in 2006 at Morgan Stanley's 2004 basis, Morgan Stanley immediately lost more than $2.88 million.

documents critical to the government's investigation, def. at 6,
are highly misleading.  In reality, Peterson largely provided
documents only about his own finances and then only to the SEC
for purposes of showing which assets he would forfeit (and for
arguing that he should be allowed to keep particular assets).
Indeed, Peterson has consistently claimed that he lacks access to
most every document crucial to the government's criminal
investigation, including documents pertaining to Asiasphere's
organization, ownership, and operation and the organization,
ownership, and operation of the company through which Peterson
owned an interest in Asiasphere.[5]

_____

[5]    Peterson's claims about the effect of the government's
investigation on his family and his desire to parent his children
must be considered in context.  Although Peterson has been
married to his wife since 1997, he has fathered since 1997 four
children in extramarital affairs that often lasted for years.
PSR ¶¶ 41, 44.  He has children in Singapore, China, and the
United States.  PSR ¶¶ 45-48.  Peterson's personal relationships
call into question his argument that his family will be
irrevocably damaged if he is incarcerated.  In any event,
innocent family members are often the victims of criminal
activity by defendants.  Such collateral consequences are
improper bases for downward departures.  USSG § 5H1.6 ("family
ties and responsibilities are not ordinarily relevant in
determining whether a departure may be warranted").  The
Sentencing Commission expected that harm to caretaking
relationships and a loss of financial support would be
"ordinarily incident" to an incarceratory sentence.  Id., App.
1(B)(ii).  Accordingly, family ties and responsibilities can
serve as the basis for a downward departure only where the harm
caused by incarceration "substantially exceeds" the harm
ordinarily incident when, for example, a parent is taken away
from his or her children.  Id.  See also United States v.
Johnson, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the
defendant's life, and the concomitant difficulties for those who
depend on the defendant, are inherent in the punishment of

## C.   Just Punishment and General Deterrence

Nowhere in Peterson's 83-page sentencing submission does Peterson address or even mention the effect of his requested probationary sentence upon other potential offenders or whether his requested sentence is in any way "just."  But Section 3553 requires the Court to consider, among other factors, "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct."  18 U.S.C. §3553(a)(2)(A),(B).  Surely, a probationary sentence for conspiring with an official of a foreign government to steal an asset worth nearly $7 million from investors whose interest one was duty-bound to serve sends a perverse message to others who would engage in similar conduct and to a public that is increasingly interested in seeing executives held accountable for crimes against investors.

Despite the government's best efforts, many white-collar criminals undoubtedly escape detection altogether.

> White-collar crime is difficult to detect,
> time-consuming to investigate, and costly to
> prosecute, all resulting in less certainty of
> punishment.   If  the  government  meets  its
> burden of proving every element of the crime
> beyond a reasonable doubt and the defendant is

incarceration."); <u>United States v. Galante</u>, 111 F.3d 1029, 1033 (2d Cir. 1997) (downward departures on the basis of family circumstances appropriate only when those circumstances are truly "extraordinary.").

> convicted, low rates of imprisonment or meager terms, as a result of departures, undermine the message of deterrence directed at those who willingly and knowingly have participated in similar activities but were not criminally charged.

Mary Kreiner Ramirez, Just in Crime: Guiding Economic Crime Reform After the Sarbanes-Oxley Act of 2002, 34 Loyola University Chicago Law Review 359, 414-416 (2003).  Such crimes are even more difficult to detect when they occur abroad.  Brad Richards, The Best Defense is a Good Offense: Creating and Maintaining a Compliance Culture to Address the New Reality of International White Collar Law Enforcement *6 (Aspatore) (2012) ("White collar crime tends to be more difficult to detect when committed by employees of a foreign subsidiary than when committed by US-based employees.").

From an economic perspective, if Peterson is simply released or serves a minimal sentence, one wonders why a would-be white-collar offender who learned of Peterson's sentence would be deterred from committing a similar crime.  Peterson's crime netted Peterson and his coconspirators an asset worth nearly $7 million. If Peterson has his way, Peterson will be required to return what he can of the asset (less than 50 percent of it) and to return to life with his family in Singapore.  Peterson argues for no jail time, def. at 12, and no supervised release, id. at

22

29.[6]  When he returns to Singapore, Peterson can apparently avail himself of the opportunity to open a chain of restaurants or to participate in investment opportunities that have already been offered to him.  Def. at 17-18.

"The theory of general deterrence operates on the assumption that if society punishes offenders who violate the law, others will not violate the law because they do not wish to be punished."  Kreiner Ramirez at 415-16.  Conversely, potential offenders who understand that they are unlikely to be caught and, if caught, will essentially escape punishment surely will not be deterred from committing a crime similar to Peterson's.

Peterson argues, def. at 32, that he should receive a probationary sentence because other FCPA violators——nearly always employees with supervisory authority who approve illicit payments——have been sentenced to less time than the government requested.  Such a sentence would further undermine respect for the law.

There is an increasing sense among the public that rich executives of investment firms are immune from the punishment that ordinary individuals face.  See, e.g., Rich Guys Facing Jail

---

[6]  The United States does not oppose Peterson's return to Singapore for post-incarceration supervised release.  But even that will be less onerous than supervised release for offenders residing in the United States, who are often required to submit to unannounced searches and interviews and to appear when directed before a supervising officer.

<u>Time Can Still Win a Break</u>, Pittsburgh Post-Gazette, Aug. 12, 2012, at A7; Linette Lopez, <u>Angry Jury in Mortgage Fraud Case Demands to Know why CEOs Aren't Being Put on Trial</u>, Phil's Stock World, August 10, 2012; Peter Lattman, <u>Former Banker Cleared on Mortgage Securities; Jury's Verdict a Setback for U.S. Effort to Hold Wall Street Accountable</u>, International Herald Tribune, Aug. 2, 2012, at 18 (jury's statement that verdict should not deter prosecution of criminal executives "appeared to echo frustration felt by many Americans who think that Wall Street executives had not been held responsible for questionable actions leading up to the financial crisis and that the financial industry overhaul had thus far been inadequate").

A probationary sentence for an individual who engaged in the conduct that Peterson did would only reinforce the public's sense that wealthy executives are essentially immune from prosecution. Indeed, if Peterson has his way, he will become another data point for future white-collar offenders seeking to avoid any period of incarceration for crimes that cost investors millions of dollars.

Finally, Peterson's conception of punishment is also remarkably unjust. In Peterson's estimation, his loss of reputation and his prestigious job is punishment enough. Def. at 23-24. Peterson is a well educated and relatively wealthy individual who held a prestigious position within a well-

24

respected financial institution.  Peterson studied at Cornell, at the University of Chicago, and in London.  PSR ¶ 40, 61.  He has lived in the United States, mainland China, Hong Kong, and Singapore.  PSR ¶ 40.  According to the Presentence Investigation Report, Peterson was well paid for his services, earning in 2007 and 2008 a net income of $1 million per year.  PSR ¶ 65.  In other words, Peterson is just the type of person who is likely to likely to suffer a substantial loss of reputation when caught committing crime.  In Peterson's view, serving time in prison is cumulative and unnecessary.

Who, then, should spend time in prison?  It would seem an offender who has not attended an Ivy League school or had the opportunity to travel the world, study in several countries, gain fluency in several languages, or earn in one year more than most Americans will earn in their lifetime would be the only appropriate prison inmate.  Under Peterson's argument, the only individuals who should lose their freedom are those who offend and have only their freedom to give.  It is hard to imagine a sentence less just than the one that Peterson proposes.

\* \* \*

Peterson's efforts to mislead the Court concerning the genesis of his crime—a crime fundamentally based upon deceit—call into serious question his assertion that he understands the gravity of the crime he committed, that he is

25

unlikely to engage in such deception in the future, and that he accepts responsibility for his wrongful conduct. Peterson should be sentenced within the advisory guidelines because he circumvented Morgan Stanley's internal controls to bribe an official of the Chinese government——an action that has serious consequences for the United States and for American companies transacting business in China. Indeed, this was among the primary reasons that Congress passed the FCPA in the first place. H.R. Rep. No. 95-640 ("Bribery of foreign officials by some American companies casts a shadow on all U.S. companies.... Corporate bribery also creates severe foreign policy problems for the United States."). This was no ordinary fraud, and the punishment should recognize that reality.

**III. CONCLUSION**

For the reasons set forth above, the government respectfully submits that a guidelines sentence, as those guidelines are calculated in the plea agreement, is both reasonable and appropriate for the reasons set forth herein and in light of the factors set forth in 18 U.S.C. § 3553. The government further requests that, pursuant to Peterson's plea agreement, the Court impose as part of any sentence the requirement that Peterson continue to cooperate fully in the SEC's efforts and those of the Court-appointed receiver to

forfeit, seize, or otherwise obtain control of assets that were instrumentalities and proceeds of Peterson's crime.


Dated:     August 13, 2012

                              Respectfully submitted,


LORETTA E. LYNCH                JEFFREY H. KNOX
UNITED STATES ATTORNEY          ACTING CHIEF, FRAUD SECTION
EASTERN DISTRICT OF NEW YORK    CRIMINAL DIVISION
                                U.S. DEPARTMENT OF JUSTICE


By:_____/s/_____     By:_____
    JOHN NOWAK                      STEPHEN J. SPIEGELHALTER
    ASSISTANT U.S. ATTORNEY          TRIAL ATTORNEY
                                    U.S. DEPARTMENT OF JUSTICE
                                    CRIMINAL DIV., FRAUD SECTION


271 Cadman Plaza East           1400 New York Avenue, N.W.
Brooklyn, New York 11201        Washington, D.C. 20005


27