REDACTED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA     :     Criminal No. 12-224 (JBW)

    -against-     :

    :

GARTH RONALD PETERSON,     :

    Defendant.     :

    :

## DEFENDANT GARTH PETERSON'S REPLY BRIEF

**LANKLER SIFFERT & WOHL LLP**
500 Fifth Avenue, 33rd Floor
New York, NY  10110
Tel:  (212) 921-8399

**Abigail E. Rosen (AR-8748)**
**Frank H. Wohl (FW-1737)**

*Attorneys for Garth Peterson*

**Preliminary Statement**

We respectfully submit this reply brief in reply to the Government's Sentencing Memorandum.

**Discussion**

The Government's Memorandum attacks a straw man, seeking to cast Peterson's Sentencing Memorandum as minimizing his conduct and undermining his acceptance of responsibility for his conduct.  In his letter to the Court and his sentencing memorandum, Peterson makes clear that he understood what he did was wrong and that he is very sorry for his actions.  See, e.g., Def. at 5 ("Peterson knows that what he did was wrong."); Def. at Exh. A ("I continue to deeply regret my actions."); Def. at 4 (stating that he "knew" that he was "misleading" Morgan Stanley and "intentionally circumventing Morgan Stanley's internal controls").  The information provided in his sentencing memorandum, particularly about his motive, was provided to give the Court context for his conduct, not to deny guilt or minimize his offense.

That being said, the Government's drumbeat for a harsh sentence emphasizes one side of the ledger.  While it harps on the loss range to Morgan Stanley of $2.5-7 million, it ignores the undisputed evidence that Peterson brought great value to Morgan Stanley.  He was instrumental in building Morgan Stanley's business in China.  He brought many highly profitable transactions to Morgan Stanley through his relationship with the Chinese Official and others, albeit he has acknowledged that his conduct crossed the FCPA line.  See Def. at Exhs. H, I, and J.  Indeed, the transaction that generated the $2.5-7 million in lost profits to Morgan Stanley was brought to Morgan Stanley by Peterson and apparently generated substantial profits for Morgan Stanley and

Peterson, dated August 14, 2012). If the Government intended to contest Peterson's statement concerning the source of the funds, it has had almost three years to gather its evidence.[1]

Unfortunately, neither Peterson nor his mother has documents showing that the original funding money for Paraplay came from Ms. Peterson, and we have been unable to obtain documents from the company that managed Paraplay. This is not altogether surprising — the transfer of the funds took place over ten years ago. But, in light of the Government's assertion of recent fabrication, Ms. Peterson has signed a declaration under penalty of perjury confirming Peterson's statement. See Exh. B. The documents the Government cites in its memorandum do not prove otherwise. As both Peterson and Ms. Peterson explain in their declarations, Peterson managed the funds for her even though the funds were hers. Exh. C. at ¶ 4 (Declaration of Garth Peterson, dated August 15, 2012). His failure to disclose this intra-familial arrangement to Morgan Stanley does not disprove its existence. Later, Ms. Peterson asked Peterson to list her as an owner of Paraplay to support her request to renew her Singaporean residency application. Id. at ¶ 5. Government Exhibit 2 is Peterson's exchange with the management company for Paraplay fulfilling her request.[2]

The Government also complains that "it is hard to see how" his self-help remedy was "justified—even in his own mind" because the investment had already been "wildly successful and very profitable." Gov't at 13. First, Peterson does not claim that his acts were "justified;"

---

[1] Indeed, on July 27, 2012, we provided a draft fact section of Peterson's sentencing memorandum to the Government, which included reference to the fact that the money came from Peterson's mother. Although we asked the Government to let us know of any contested facts, we received no response. Exh. D.

[2] The Government cites as proof that the money in Paraplay is his, and not his mother's, the fact that he told Paraplay's management company that "I will be the only person giving instructions for the account." Gov't at 12. The Government omits the fact that in response to the management company's email indicating that they ordinarily require a 50% owner of an account to have the authority to give instructions on the account, that Peterson indicated to the management company that "It's fine for her to give instructions but in practice she won't." This statement is consistent with the fact that she was completely uninvolved in the management of her money.

he acknowledges that they were unlawful and wrong. Def. at 4. The success of the investment does not, however, undercut Peterson's explanation that he was frustrated and angry that he was being compelled to give up his mother's stake in the venture by Morgan Stanley, the entity to which he had brought the opportunity in the first place. The fact that the investment was successful — and that he, as well as Morgan Stanley, expected it to become more valuable — was the exact reason that he would want to preserve his mother's interest in the investment.

Finally, Peterson has no motivation here to falsify the source of the money. His self-help explanation remains essentially the same whether the money was his mother's or his. Peterson brought the opportunity to Morgan Stanley, and it was ultimately worth millions of dollars to Morgan Stanley. Morgan Stanley pushed Peterson out of that investment. He wrongly and unlawfully engineered a self-help remedy to recoup the investment by deceiving Morgan Stanley.

### b. The Cultural Context of Peterson's Offense

The Government argues that Peterson's inclusion of the Chinese Official was not an expression of "guanxi" because the value of the Chinese Official's interest was too great to fit within the technical definition of "guanxi." Gov't at 13-14. Whether the term "guanxi" applies misses the point. Peterson seeks to provide the Court with the full context for his actions, including the cultural and relationship-based motivations for his offense. Peterson acknowledges that the Chinese culture and Peterson's own desire to build his relationship with the Chinese Official do not justify his offense. Cultural context and motives, however, can be relevant to a defendant's character for sentencing purposes, and Peterson asks the Court to consider those factors here.

### 2. Peterson's Cooperation

The Government takes issue with Peterson's description of the extent of his cooperation, claiming that Peterson's desire to cooperate with the Government's investigation did not require that he remain away from his family for an extended period of time.  Gov't at 19.  While it is true that the Government did not ask Peterson to remain in the United States during his cooperation, Peterson's circumstances compelled that result. The reason Peterson came to the United States was to cooperate.  He returned to the United States from Singapore in August 2009 to meet with his counsel.  In September 2009, his counsel provided an attorney proffer to the Government, and indicated that Peterson wished to cooperate and take responsibility for his conduct.  Peterson had to cancel a proffer session scheduled for October 28, 2009 due to his alcohol treatment.  He attended a proffer session on November 16, 2009.  He appeared for two proffer sessions the next month.  He was hoping that his case would be wrapped up shortly and he remained in the United States, despite his desire to return to his family in Singapore, awaiting further communication from the Government, until April 2010.  At that point, hearing no further news from the Government, he informed the Government through counsel that he would return to Singapore and await instructions.  Peterson again returned to the United States for an additional proffer on June 22, 2010, and has remained in Singapore since then, except for returning to the United States to plead guilty, and now to be sentenced.

The Government asserts that the "real reason" Peterson resided in the United States during this time was because he left his home in Singapore following a period of marital tension, as revealed in Peterson's wife's letter to the Court.  Gov't at 19 (citing Def. at Exh. C).  Contrary to the Government's suggestion that Peterson's family did not want him in Singapore (or that his family would not be damaged by his absence if he were incarcerated), see Gov't 19-20 & n.5,

Peterson's wife reports that "[i]t was tough for all of us during that time [that Garth was away]," and details how much their children missed him.  Def. at Exh. C.  An e-mail from Peterson's wife during the period that Peterson was in the United States confirms that there can be no serious dispute that the reason Peterson was in the United States was to cooperate with the Government.  In April 2010, Peterson's wife asked his counsel if Peterson could travel back to Singapore without the Government's permission since he had not been charged.  She wrote: "It's been more than 7 months since my kids and I last saw Garth.  It's sad that instead of spending time bonding with this family in Sinagpore, he's in the U.S."  Exh. E (Email from Shuling,[3] Peterson's wife, to Frank Wohl, dated April 2, 2010).  After that, we informed the Government that Peterson would be returning to Singapore.  Exh. F (Email exchange between AUSA Jonathan Green and Frank Wohl, counsel for Peterson, dated April 19, 2010) ("I want to let you know that, after my last voicemail to you, we decided that, inasmuch as we have not heard anything for a while, and it seems that Peterson's situation is not going to be resolved right away, we decided that he should go back to Singapore to spend some time with his wife and children.  He is there, but will return when you want him to do so.").

The Government argues that Peterson's claims regarding his provision of documents are "highly misleading" because he was not able to provide the Government with certain documents related to Asiasphere that it viewed as crucial to its investigation.  Gov't at 19-20.  The Government does not dispute that Peterson provided all the documents he had access to.  Peterson's lack of access to Asiasphere documents is understandable.  In fact, he asked Asiasphere's attorney for the Asiasphere documents and turned over what he was given to the

---

[3] Shuling and Aw Sok-Ling are the same person.  Aw is Peterson's wife's maiden name.  Sok-Ling and Shuling are different spellings of the same name.

Government.  Nor does the Government dispute his statement that he spent considerable effort obtaining and providing documents the Government and the SEC requested of him.

### 3.  Peterson's Need to Support and Raise His Family

The Government says that "Peterson's personal relationships call into question his argument that his family will be irrevocably damaged if he is incarcerated."  Gov't at 20, n.5.  As Peterson acknowledged in his interview with probation, he has had extra-marital affairs that resulted in children being born out of wedlock.  This is unfortunate and not commendable.  However, despite this, he remains married to his wife, and they are raising their two children together.  As his various letter writers noted, Peterson has a close relationship with his and his wife's children.  See Def. at Exhs. B, C, D, E, and F; see also Exh. E (Email from Shuling to Frank Wohl, dated April 2, 2010) ("I just wish for Garth and our kids to be able to spend time together."); Exh. G (Email from Shuling to Abigail Rosen, dated May 13, 2010) (asking whether Peterson's trip to meet with the Government could be scheduled to allow Peterson to spend time with his daughter "during the school holidays" because it would "break her heart" if he could not be around).

### 4.  Peterson's Low Probability of Recidivism

The  Government takes issue with Peterson's argument that "his crime was anomalous with Peterson's otherwise law-abiding life,"  Gov't at 17 (citing Def. at 27), and describes how the conduct at issue in this case took place over a period of time and involved a series of illegal acts.  Gov't at 18.  Peterson does not state otherwise.  Def. at 27.  While he worked for Morgan Stanley, he engaged in misconduct and alcoholism.  This was an anomaly in his life.  His acknowledgment of his wrongdoing from the beginning of this investigation gives every

indication that he sincerely wants to make a fresh start, and return to the type of responsible behavior that allowed him to support his family and perform well in school.

**5.  The Need to Avoid Unwarranted Sentencing Disparities**

The Government urges the Court to reject a probationary or below-guidelines sentence—which would be in line with the sentences received by other FCPA violators, see Def. at 32—because "[s]uch a sentence would further undermine respect for the law" and would not provide sufficient general deterrence.  Gov't at 21-23.  The Government ignores that the Court must consider, in addition to promoting respect for the law and affording adequate deterrence, "the need to avoid unwarranted sentencing disparities."  18 U.S.C. § 3553(a)(6).  The courts that sentenced 81% of post-Booker FCPA defendants to below-guidelines sentences were also required to consider the need to promote respect for the law and to provide adequate deterrence, but nevertheless concluded that below-guidelines sentences were sufficient to comply with the purposes of §3553(a).  See Def. at 32.

## CONCLUSION

For these reasons, and the reasons explained in Peterson's original sentencing memorandum, the Court should sentence Peterson to no or minimal incarceration.

LANKLER SIFFERT & WOHL LLP

By: _____

Abigail E. Rosen (AR-8748)
Frank H. Wohl (FW-1737)
500 Fifth Avenue, 33rd Floor
New York, NY  10110
Tel:  (212) 921-8399

*Attorneys for Defendant Garth Peterson*

8

# EXHIBIT A

ASSET TRANSFER AGREEMENT

This Agreement ("Agreement"), is effective as of March 8, 2012 ("Effective Date") and is made by and between Dianne Peterson ("DP"), Paraplay Investment Limited, a British Virgin Islands ("BVI") entity ("Paraplay") and Garth Peterson ("GP").

RECITALS

WHEREAS, the purpose of the Agreement is to memorialize the conveyance of Paraplay, including and any of its holdings (the "Asset"), from DP to GP as of the Effective Date.

WHEREAS, Paraplay at one time may have owned and may still own 81% of Strong Man, a BVI entity, which in turn at one time may have owned and may still own 53% of Asiasphere, a BVI entity, which in turn at one time may have owned and may still own 12% of Jin Lin Tiandi Holding Company, a Cayman Islands entity;

WHEREAS, Jin Lin Tiandi Holding Company, through a series of 100% held subsidiary companies, is the 100% owner of Shanghai Jin Lin Tiandi Serviced Apartments, a serviced apartment building in Shanghai. The investment in Shanghai Jin Lin Tiandi Serviced Apartments was labeled "Cavity" by Morgan Stanley;

WHEREAS, DP acts on behalf of herself, and to whatever extent she is or was a director or direct or indirect owner of Paraplay;

WHEREAS, GP caused Paraplay to invest in Cavity, an investment GP worked on while employed at Morgan Stanley;

WHEREAS DP did not at any time have detailed knowledge of or participate in the commercial activities of Paraplay apart from giving GP sole authority to invest on behalf of Paraplay or any named company for the purpose only of obtaining a better interest rate than banks were currently providing;

WHEREAS, DP desires to convey and transfer whatever interest that she may have in the Asset to GP and GP desires to accept such conveyance and transfer effective as of the Effective Date;

WHEREAS, this conveyance and transfer is made in contemplation of GP's settlement with the United States Securities and Exchange Commission ("SEC"), and contingent on GP entering into an agreement with the SEC requiring him to relinquish the Asset as part of that settlement as disgorgement.

NOW, THEREFORE, in consideration of the foregoing premises, the parties agree as follows:

1. Transfer of Assets. DP hereby conveys and transfers to GP whatever her right, title and interest in the Asset. GP hereby accepts such conveyance and transfer.

2. **Cooperation in Contract Administration.** DP agrees to cooperate with GP, including helping GP fulfill his obligations to any third party in respect to matters concerning Paraplay or the Asset if called upon to do so. In the event DP receives any payment in connection with the Asset after the Effective Date, DP shall promptly notify GP.

3. **Miscellaneous.**

3.1 **Notices.** All notices, billings, requests, demands, approvals, consents, and other communications which are required or may be given under this Agreement shall be in writing and will be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid to the parties at their respective addresses set forth below:

If to GP:

Garth Peterson



If to DP:

Dianne Peterson

and

Dianne C Peterson

4.2 **No Assignment.** This Agreement is not assignable.

3.3 **Applicable Law.** This Agreement shall be governed by and construed under the laws of the State of New York applicable to contracts made and to be performed therein.

3.4 **Headings.** The section headings used in this Agreement are for convenience of reference only and will not be considered in the interpretation or construction of any of the provisions thereof.

3.5 Amendments; Waivers. No amendment, waiver of compliance with any provision or condition hereof, or consent pursuant to this Agreement, will be effective unless evidenced by an instrument in writing signed by the parties.

3.6 Severability. If any terms or provisions hereof or the application thereof to any circumstances shall be found by any court having jurisdiction to be invalid or unenforceable to any extent, such term or provision shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining terms and provisions hereof or the application of such term or provision to circumstances other than
those as to which it is held invalid or unenforceable.

3.7 Further Assurances. Subject to the provisions hereof, the parties hereto shall make, execute, acknowledge and deliver such other instruments and documents, and take all such other actions, as may be reasonably required in order to effectuate the purposes of this Agreement and to consummate the transactions contemplated hereby.

3.8 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed Agreement on the date shown below and effective as of the Effective Date as written above.

Signed:

_____

Garth Ronald Peterson

Signed:

_____

Dianne Peterson

Sworn to before me this
1 day of _____, 2012

_____

Brooke H. Dean
Vice Consul of the
United States of America

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES, | : Criminal No. 12-224 (JBW) |
| -against- | : |
| GARTH RONALD PETERSON, | : |
| Defendant. | : |
| | : |
| | : |

## DECLARATION OF DIANNE PETERSON

I, DIANNE PETERSON, having personal knowledge of the facts stated in this declaration, hereby declare:

1.  I am Garth Peterson's mother.

2.  I understand that the United States has responded to Garth Peterson's sentencing memorandum and has disputed his assertion that he invested my money for me.

3.  In 2002, I asked Garth to manage my retirement savings that I had saved largely from my Central Provident Fund, which is a Singapore Retirement Fund related to my being a teacher at the Singapore American School in Singapore, and the sale of my apartment in Singapore.

4.  Once I gave the money to Garth, I had no involvement in the management of the money. I did not ask him how he invested it.

5.  Garth later told me that he held my investments in an entity called Paraplay Investment Limited.

6.  I subsequently learned that, through Paraplay, Garth made an investment in something called Project Cavity, a Morgan Stanley investment.

7. In connection with Garth's settlement with the S.E.C., and at the request of the S.E.C., I signed a document, called the Asset Transfer Agreement, attached to this declaration, transferring my interest in Paraplay and the Project Cavity investment to Garth.

8. I signed the Asset Transfer Agreement because the money Garth used to set up Paraplay came from my retirement savings.

9. As a result of transferring the Cavity investment to Garth for his settlement with the S.E.C., I lost my savings.

10. At this point, ten years after I transferred the money to Garth to manage, I have no documents that reflect my savings prior to 2002 or their transfer to Garth.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _14 Aug 2012_

_Dianne C. Peterson_

DIANNE PETERSON

## ASSET TRANSFER AGREEMENT

This Agreement ("Agreement"), is effective as of March 8, 2012 ("Effective Date") and is made by and between Dianne Peterson ("DP"), Paraplay Investment Limited, a British Virgin Islands ("BVI") entity ("Paraplay") and Garth Peterson ("GP").

## RECITALS

WHEREAS, the purpose of the Agreement is to memorialize the conveyance of Paraplay, including and any of its holdings (the "Asset"), from DP to GP as of the Effective Date.

WHEREAS, Paraplay at one time may have owned and may still own 81% of Strong Man, a BVI entity, which in turn at one time may have owned and may still own 53% of Asiasphere, a BVI entity, which in turn at one time may have owned and may still own 12% of Jin Lin Tiandi Holding Company, a Cayman Islands entity;

WHEREAS, Jin Lin Tiandi Holding Company, through a series of 100% held subsidiary companies, is the 100% owner of Shanghai Jin Lin Tiandi Serviced Apartments, a serviced apartment building in Shanghai. The investment in Shanghai Jin Lin Tiandi Serviced Apartments was labeled "Cavity" by Morgan Stanley;

WHEREAS, DP acts on behalf of herself, and to whatever extent she is or was a director or direct or indirect owner of Paraplay;

WHEREAS, GP caused Paraplay to invest in Cavity, an investment GP worked on while employed at Morgan Stanley;

WHEREAS DP did not at any time have detailed knowledge of or participate in the commercial activities of Paraplay apart from giving GP sole authority to invest on behalf of Paraplay or any named company for the purpose only of obtaining a better interest rate than banks were currently providing;

WHEREAS, DP desires to convey and transfer whatever interest that she may have in the Asset to GP and GP desires to accept such conveyance and transfer effective as of the Effective Date;

WHEREAS, this conveyance and transfer is made in contemplation of GP's settlement with the United States Securities and Exchange Commission ("SEC"), and contingent on GP entering into an agreement with the SEC requiring him to relinquish the Asset as part of that settlement as disgorgement.

NOW, THEREFORE, in consideration of the foregoing premises, the parties agree as follows:

1. Transfer of Assets. DP hereby conveys and transfers to GP whatever her right, title and interest in the Asset. GP hereby accepts such conveyance and transfer.

2. Cooperation in Contract Administration. DP agrees to cooperate with GP, including helping GP fulfill his obligations to any third party in respect to matters concerning Paraplay or the Asset if called upon to do so. In the event DP receives any payment in connection with the Asset after the Effective Date, DP shall promptly notify GP.

3. Miscellaneous.

3.1 Notices. All notices, billings, requests, demands, approvals, consents, and other communications which are required or may be given under this Agreement shall be in writing and will be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid to the parties at their respective addresses set forth below:

If to GP:

Garth Peterson



If to DP:

Dianne Peterson

and

Dianne C Peterson

4.2 No Assignment. This Agreement is not assignable.

3.3 Applicable Law. This Agreement shall be governed by and construed under the laws of the State of New York applicable to contracts made and to be performed therein.

3.4 Headings. The section headings used in this Agreement are for convenience of reference only and will not be considered in the interpretation or construction of any of the provisions thereof.

3.5 Amendments; Waivers. No amendment, waiver of compliance with any provision or condition hereof, or consent pursuant to this Agreement, will be effective unless evidenced by an instrument in writing signed by the parties.

3.6 Severability. If any terms or provisions hereof or the application thereof to any circumstances shall be found by any court having jurisdiction to be invalid or unenforceable to any extent, such term or provision shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining terms and provisions hereof or the application of such term or provision to circumstances other than
those as to which it is held invalid or unenforceable.

3.7 Further Assurances. Subject to the provisions hereof, the parties hereto shall make, execute, acknowledge and deliver such other instruments and documents, and take all such other actions, as may be reasonably required in order to effectuate the purposes of this Agreement and to consummate the transactions contemplated hereby.

3.8 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed Agreement on the date shown below and effective as of the Effective Date as written above.

Signed:

_____
Garth Ronald Peterson

Signed:

_____
Dianne Peterson

Sworn to before me this
____ day of _____, 2012

_____
Brooke H. Dean
Vice Consul of the
United States of America

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES, | : Criminal No. 12-224 (JBW) |
| -against- | : |
| GARTH RONALD PETERSON, | : |
| Defendant. | : |

## DECLARATION OF GARTH PETERSON

I, GARTH PETERSON, having personal knowledge of the facts stated in this declaration, hereby declare:

1. I am the defendant in this case.

2. I managed my mother's retirement savings for her. I put the investment entity, Paraplay Investments Limited ("Paraplay"), in my name at her request. Also at her request, I acted as the sole owner and manager of Paraplay.

3. We understood between us that the money was hers.

4. I told Morgan Stanley that I was the owner of Paraplay consistent with my role acting as the manager of the entity.

5. In 2005, I asked Wintrust, the entity that managed Paraplay, to list my mother as a 50% beneficial owner of Paraplay at my mother's request. At that point, my mother was seeking to get her Singaporean residency renewed and had no income. She was concerned that her application would be denied without proof that she could support herself. She asked me to have her name added to the Paraplay documents. I sent an email to Wintrust consistent with her request.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: <u>15th Aug 2012</u>

GARTH PETERSON

# EXHIBIT D

| | |
|---|---|
| **From:** | Abigail Rosen |
| **To:** | "Nowak, John (USANYE)"; "Spiegelhalter, Stephen" |
| **Cc:** | Frank Wohl |
| **Subject:** | Garth Peterson |
| **Date:** | Friday, July 27, 2012 3:09:58 PM |
| **Attachments:** | GP Facts for Government Review.DOCX |

John and Steve,

As I discussed with John, I have attached a draft of the fact section of our sentencing memo to this email.  I would appreciate if you would let me know if you would contest anything in this draft.

Thanks,
Abby

Abigail E. Rosen

### Garth Peterson Facts

Prior to 2002, Garth was close friends with a man who was the head of Yongye, a

Chinese company.  Yongye is a state-owned real estate investment corporation in the Luwan

district of Shanghai.  Garth understood that his friend's position made him a "foreign official"

under the Foreign Corrupt Practices Act (hereafter, "the Chinese Official").  Garth and the

Chinese Official became close before Garth started working at Morgan Stanley.  They met

through a job that Garth had in 1993 and they forged a mentor mentee relationship.  They often

met for dinner after work.  From 1995, when Garth left Shanghai to go to business school, until

2002, when Garth started at Morgan Stanley, Garth occasionally traveled to Shanghai to visit the

Chinese Official without any business purpose.  They were so close that Garth considered him to

be like the father that he never had.  After Garth started working at Morgan Stanley, they

renewed their business relationship.

Also prior to 2002, Garth's mother asked him to help her invest her retirement funds.

Garth approached the Chinese Official about ideas for an investment for his mother and the

Chinese Official told Garth about a real estate investment in Shanghai that was called the "Site

#9" development project.  Site #9 was a city block in the Luwan district of Shanghai and was

slated to be developed into a number of different buildings, including a full service apartment

building, similar to the American model of a long stay hotel.  Through the Chinese Official,

Garth invested his mother's retirement money in the Site #9 development project.

In 2002, Garth took a job with Morgan Stanley in China.  When Garth joined Morgan

Stanley, he informed them about the investment in Site #9 and Morgan Stanley allowed him to

retain it.  From 2002 to 2008, Garth worked for Morgan Stanley in a group that made real estate investments in China.

After he joined Morgan Stanley, and was encouraged by his boss to identify investment opportunities in China, Garth proposed to Morgan Stanley that it should invest in the Site #9 development project as well.  Morgan Stanley decided to do so, and invested $3.4 million for 10% of the Site #9 development project.  When Morgan Stanley made that investment, it called the investment "Project Wally."  Morgan Stanley completed its investment in Project Wally in 2003, a year after Garth had joined the firm.[1]

After Morgan Stanley invested in Project Wally, the group of owners, including Garth and Morgan Stanley, began selling off assets developed on Site #9 and returning capital to the investors.  Ultimately, only one building was left – the full service apartment building.  The owners decided to sell it.  An Australian bank, Macquarie, entered into negotiations to buy the building but those negotiations failed.  Morgan Stanley then decided to purchase the serviced apartment building from the consortium of owners, becoming a 100% owner of the building instead of a 10% owner.  They called that investment — buying the full service apartment building from Project Wally — "Project Cavity."

Morgan Stanley's decision to invest in Project Cavity forced Garth to sell his mother's holding in the real estate investment.  Garth did not want to do so and asked his boss at Morgan Stanley, Zain Fancy, if he could remain an investor in the building.  Zain told him that he should not even raise the idea to others at Morgan Stanley because it would not be well received, and Garth dropped it.  Morgan Stanley bought Project Cavity in 2004.  The Chinese Official helped ensure that Morgan Stanley was able to buy the building.

---

[1] Morgan Stanley purchased the investment for the same per share price as the initial investors, even though it invested a year later.

Garth was frustrated that he had been forced to liquidate the investment he had made for his mother, so he decided to seek a self-help remedy: to secretly buy back into Project Cavity at the same price at which he was forced to sell. To do this, two years later, in early 2006, Garth encouraged Morgan Stanley to sell a 12% interest in Project Cavity to an entity called Asiasphere at the price Morgan Stanley had paid for the investment in 2004. Garth, along with another person, misrepresented to others at Morgan Stanley that Asiasphere was owned by Yongye, the Luwan district real estate investment company. Garth convinced Morgan Stanley to sell a piece of the investment to "Yongye" because of the prior assistance that Morgan Stanley had received from the Chinese Official. Morgan Stanley likely also perceived a benefit to selling a portion of the investment to a local investor fluent in Chinese. However, Asiasphere was actually controlled by Garth, the Chinese Official, and another person. Garth convinced Morgan Stanley to sell a portion of Project Cavity to Asiasphere in order to restore his mother's investment in Site #9. He included the Chinese Official in Asiasphere in order to pay him back for favors that the Chinese Official had extended to Garth. Unlike the traditional FCPA case, Garth had a close relationship with the Chinese Official. He did not invest with the Chinese Official in order to obtain a specific business outcome, but out of a misplaced desire to help the Chinese official for all he had done for Garth over the years.

Garth knew that by misleading Morgan Stanley into believing that Asiasphere was owned by Yongye, he was intentionally circumventing Morgan Stanley's internal controls, which were designed to prevent the transfer of items of value to foreign officials and to Morgan Stanley employees. In March 2006, the sale to Asiasphere was consummated and the Chinese Official, his co-conspirator, and Garth became investors in Project Cavity.

Garth knows that what he did was wrong, and pled guilty before Your Honor on April 25, 2012.

# EXHIBIT E

| | |
|---|---|
| **From:** | Shuling |
| **To:** | Frank Wohl |
| **Subject:** | Garth |
| **Date:** | Friday, April 02, 2010 11:26:01 AM |

Dear Frank,

Hope you're well.

It's been more than 7 months since my kids and I last saw Garth.  It's sad that instead of spending time bonding with his family in Singapore, he's in the U.S (a country where he's spent very little time before) - literally wasting precious time - bouncing from one place to another - with nothing productive to do.  My 6yr old daughter who's very close to her dad, misses him a great deal and keeps asking when papa's going to come home. My son, who is already 16 months old, has not had a "real moment" with his dad just simply because everything unfolded shortly after he was born.  Garth has missed out so much - first crawl, first step, first word...

To my understanding, Garth hasn't been charged.  Why does he need to seek permission to travel out of the U.S, to  be with his family in Singapore?  He said he has put in a request a while back, but has yet to be given a reply.

He is at the mercy of others, while our kids are the biggest losers.

Frank -  I hope you understand my situation here.  I just wish for Garth and our kids to be able to spend time together.   Please help him.

Hope to hear back from you.  Thank you.


Regards,
Shuling


Send instant messages to your online friends http://uk.messenger.yahoo.com

# EXHIBIT F

| | |
|---|---|
| **From:** | Green, Jonathan (USANYE) |
| **To:** | Frank Wohl |
| **Subject:** | RE: Garth Peterson |
| **Date:** | Monday, April 19, 2010 11:38:36 AM |

Thanks for the update Frank, and please accept my apologies for not getting back to you sooner.  I will keep you informed.

-Jon

**From:** Frank Wohl ██████████████
**Sent:** Monday, April 19, 2010 11:33 AM
**To:** Green, Jonathan (USANYE)
**Subject:** Garth Peterson

Jonathan,
I want to let you know that, after my last voicemail to you, we decided that, inasmuch as we have not heard anything for a while, and it seems that Peterson's situation is not going to be resolved right away, we decided that he should go back to Singapore to spend some time with his wife and children.  He is there, but will return when you want him to do so.
Frank

# EXHIBIT G

| From: | Shuling |
|---|---|
| To: | Abigail Rosen |
| Cc: | Frank Wohl |
| Subject: | Garth |
| Date: | Thursday, May 13, 2010 12:15:08 AM |

Dear Abby,

Garth says he has to go back to the U.S. in mid-jun.

My daughter's last day of school in on 18th June.  It will certainly break her heart to know that her dad won't be around during the school holidays.  Garth's social visa allows him to be in Singapore till 15th July.  Is it possible to postpone the meeting with the prosecutor till then?

This would mean a whole lot to my girl.

Thank you.


Shuling

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she caused a redacted copy of the foregoing Defendant Garth Peterson's Reply Brief to be served on all counsel of record on the 15th day of August 2012, via the Court's electronic filing system.


Dated: August 15, 2012

LANKLER SIFFERT & WOHL LLP

By: _____

Abigail E. Rosen (AR- 8748)
500 Fifth Avenue
New York, New York 10110
Telephone (212) 921-8399
Arosen@lswlaw.com